IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
(GALVESTON DIVISION)

| | | |
|---|---|---|
| ROSAMARIA GOMEZ RODRIGUEZ, | § | |
| Individually and as Personal Representative | § | |
| of the Estate of RODOLFO RODRIGUEZ, | § | |
| Decedent, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE #: 3:19-cv-00268-VDG |
| | § | |
| UNION PACIFIC RAILROAD, | § | |
| INDIVIDUALLY, AND AS SUCCESSOR- | § | |
| IN-INTEREST TO SOUTHERN PACIFIC | § | |
| TRANSPORTATION COMPANY, | § | |
| Defendant. | § | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE THE CAUSATION OPINION OF DANIEL CATENACCI, M.D.**

Plaintiff Rosamaria Gomez Rodriguez files this Response in Opposition to Defendant's Motion Exclude the Causation Opinions of Daniel Catenacci, MD [Doc. 31] as follows:

**Nature and Stage of the Proceeding**

The motions deadline is October 30, 2020. Docket call in the case is scheduled for January 29, 2021, with a three-day trial soon thereafter.

**Issues to be Ruled Upon and Standard of Review**

The standard of review regarding the admissibility of expert evidence in abuse of discretion. *Seaman v. Seacor Marine L.L.C.,* 326 F. App'x 721, 723 (5th Cir. 2009).

**Introduction**

This Response is filed in opposition to Defendant's *Daubert* motion [Doc. 31] challenging the opinion testimony of University of Chicago oncologist Dr. Daniel Catenacci who opines (a) that asbestos is a human carcinogen, (b) that it is a cause of colon cancer, and (c) that one of the probable causes of the colon cancer that killed Rodolpho Rodriguez was his exposure to airborne asbestos during the 10+ years that he worked for Southern Pacific Railroad.

Before turning to the substantive Response to Defendant's challenge, it is important to put that challenge in context. First, this is Defendant's only *Daubert* challenge. It does not challenge our industrial hygiene expert Rich Miller, whose 62-page report documents the extensive *exposures* to asbestos that Rodriguez had while working for Southern Pacific. Nor does it challenge the report of Dr. Courtney Crim, the *only* NIOSH certified B-reader designated as an expert in this case. Dr. Crim's report provides objective evidence of Rodriguez's exposure to asbestos. Dr. Catenacci relies on both of these "reliable" reports in forming his *specific causation* opinion.

Second, to put this Motion into context, we incorporate herein by reference the two *Daubert* motions filed by Plaintiff in this case seeking to exclude defense expert Stephen Dawkins, an occupational physician who does not treat colon cancer patients and whose five-page report fails to cite to a single peer-reviewed scientific article. Docs. 27-29. In stark contrast to Dr. Dawkins is Dr. Catenacci, the Director of the Gastrointestinal Medical Oncology Program at the University of Chicago. He is an academic oncologist who treats colon cancer patients, trains other physicians who do so, performs laboratory research on colon cancer, publishes in the arena, and whose report cites 71 peer-reviewed scientific articles and other references that support his opinions. Clearly, Dr. Catenacci satisfies all four *Daubert* criteria and the fifth "intellectual rigor" requirement of *Kumho* in spades. Accordingly, that this motion should be summarily denied.

## Overview

This is an FELA personal injury and wrongful death case brought by Plaintiff Rosamaria Gomez Rodriguez, individually and as the Personal Representative of the Estate of Rodolpho Rodriguez. Rosamaria is the wife of the decedent. Rodriguez worked as a track laborer for Southern Pacific Transportation Company from 1969 until 1981. Throughout his career he had significant exposure to asbestos. In 2016, Rodriguez was diagnosed with colon cancer and underwent treatment. Unfortunately, he ultimately died of colon cancer in 2017.

As the Court well knows, there are usually two major foci of causation in a toxic tort case, i.e. *general causation,* and *specific causation.* The **general** causation question is (a) is asbestos a human carcinogen, and (b) if so, does it "probably" cause colon cancer? The **specific** causation question in a FELA case is, "did Rodriguez's occupational exposure to asbestos **'play any part, even the slightest'** in causing Rodriguez's colon cancer?"

To answer these questions, Plaintiff designated Dr. Catenacci. Significantly, Dr. Catenacci's primary medical practice involves (a) treating people with gastrointestinal cancers, including colon cancer, (b) teaching other doctors how to do so, and (c) performing laboratory research on gastrointestinal cancers, including colon cancer. Ex. A (Expert Report of Daniel Catenacci, MD); Ex. B (CV of Daniel Catenacci, MD). Therefore, his opinions are based on a strong foundation of clinical and academic experience. Additionally, Dr. Catenacci undertook an extensive review of the "whole body of science," including the extensive peer-reviewed scientific literature. His report cites 71 different references in support of his opinions.

### Argument and Authorities

Although *Daubert, Joiner* and *Kumho* illuminate the "gates" that his Court must "keep," we begin with this Court's chary admonition that a trial court should not "apply the reliability factors too stringently and 'transform a *Daubert* hearing into a trial on the merits.'" *McManaway v. KBR, Inc.*, No. CV H-10-1044, 2012 WL 13059744, at *3 (S.D. Tex. Aug. 22, 2012).

## I.   STANDARDS GOVERNING THE COURT'S DISCRETION AS "GATEKEEPER".

This Court is well acquainted with its "gatekeeping" responsibilities under Rule 702, *Daubert*, and its progeny. *See McManaway,* No. CV H-10-1044, 2012 WL 13059744, at *3. The three main foci under FRE 702 and *Daubert* are first, to be sure that the expert is "qualified" within the ambit of Rule 702, and then to serve as "gatekeep[ers]" to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm.,*

*Inc.*, 509 U.S. 579, 589, 597 (1993). The four factors that the *Daubert* court itself articulated to evaluate the "**reliability**" of an expert include "[i] whether the expert's theory or technique can be or has been tested, [ii] whether it has been subjected to peer review, [iii] whether it has a known or potential rate of error or standards controlling its operation, and [iv] whether it is generally accepted in the relevant scientific community. *McManaway, supra,* citing *Dart v. Kitchens Bros. Mfg. Co.*, 253 Fed. Appx. 395, 397 (5th Cir. 2007) and *Daubert*, 509 U.S. at 592-93).

Plaintiff acknowledges and accepts the fact that "the burden is on the proponent of expert testimony to show by a "preponderance of proof" that the expert meets each of the *Daubert* admissibility requirements. *Id.* at 592 fn.10 (Emphasis added); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). It is a burden Plaintiff gladly accepts in this case.

## II.   DR. CATENACCI IS EMINENTLY WELL-QUALIFIED TO RENDER "HELPFUL" OPINIONS ON THE ISSUES IN THIS CASE.

UP does not challenge Dr. Catenacci's qualifications, and for good reason. Such a challenge would be entirely baseless. Nonetheless, the first step a Court must take under Rule 702 is to determine if the proposed expert is "**qualified** as an expert by knowledge, skill, experience, training or education." FED. RULE OF EVID. 702. Therefore, we begin with Dr. Catenacci's very impressive credentials. As noted above, he is not only a treating physician, whose specialty in oncology includes helping patients with the very same disease that killed Rodriguez, but also a professor of medicine who writes, teaches, and supervises other doctors learning this field.

As this Court's prior opinion observes, to be qualified, the expert must have the minimal education or experiential qualifications in a field that is relevant to a subject that will assist the trier of fact. *McManaway,* No. CV H-10-1044, 2012 WL 13059744, at *3 (Citing *Daubert*, 509 U.S. at 591). "If the expert passes this threshold test, the Court should further determine whether the expert's area of expertise informs the particular opinion that the expert seeks to offer." *Id*.

*Daubert* jurisprudence discuss the importance of "fit". There are few doctors in the world whose credentials "fit" the requirements of this case as well as Dr. Catenacci.

## III.    DR. CATENACCI'S GENERAL CAUSATION OPINION IS "RELIABLE."

Significantly, UP chose not to depose Dr. Catenacci in this case. Therefore, unless the Court wants to hold an evidentiary *Daubert* hearing, the primary focus at this point must be Dr. Catenacci's report. It is a 15-page discourse that cites 71 sources/references. Plaintiff believes that it is sufficient to deny the motion altogether. However, if the Court has any concerns, we are certainly amenable to an evidentiary hearing, via Zoom or otherwise, to flesh out the record.

The reliability inquiry begins with *Daubert* itself. *Daubert* was a case involving extremely horrible conditions (birth defects), allegedly caused by exposure to a toxic substance. The pharmaceutical industry argued for a very stringent *Frye* standard of "general acceptance." The Supreme Court rejected it, adopting instead, four flexible guideposts. The first is "*general acceptance.*" If something is "generally accepted" by the entire scientific community, then expert opinion testimony on point is clearly admissible. Therefore, we start with that criterion.

### A.    It is "Generally Accepted" that Asbestos is a *Known* Human Carcinogen. As

UP's Motion concedes, the authoritative International Agency for Research on Cancer (IARC) organization has listed asbestos as a "Category 1" substance, which means, that not merely is it "probable" that it causes cancer, rather, it is **known** to cause cancer. This is not proof by a "preponderance" of the evidence, it is proof beyond a "reasonable doubt."

UP correctly notes that the Fifth Circuit, like IARC and other regulatory bodies use a "weight of the evidence" approach to the classification of a toxic agent's carcinogenicity. Page 4 of Dr. Catenacci's report lists the four major IARC classifications. Asbestos is in Group 1, which means that the totality of the available scientific evidence establishes that it is "definitely carcinogenic to humans" which equates to "general acceptance" in *Daubertese.*

**B.**      **Peer Review, Rates of Error, and Animal Testing Provide a Reliable Basis of an Expert Opinion that Asbestos Causes Colon Cancer.** Asbestos causes cancer in humans. But what about **colon** cancer specifically? Again, UP is truthful. But only halfway truthful. It correctly points out that IARC has, thus far, only found an "association" between asbestos and **colon** cancer. "Association" is an epidemiological term. "Epidemiology attempts to define a relationship between a disease and a factor suspected of causing it" and, thus, has been acknowledged to be "the most useful and conclusive type of evidence in a case such as this." *Brock v. Merrell Dow Pharm., Inc.,* 874 F.2d 307, 311 (5th Cir.), *modified on reh'g,* 884 F.2d 166 (5th Cir. 1989).

The standard methodology for assessing the reliability of epidemiological evidence that warrants an inference of causation from a demonstrable association is the nine factors listed by Sir Austin Bradford Hill in his seminal 1965 article entitled "*The Environment and Disease: Association or Causation,"* 58 Proc. Royal Soc'y Med. 295 (1965). Ex. C. These criteria include strength of association, consistency, specificity of association, temporality, dose response curve, biological plausibility, coherence, experiment, and analogy. *Id.* Numerous cases, plus the federal scientific REFERENCE MANUAL, all cite the Bradford Hill factors as being an authoritative methodology to determine "reliability" under *Daubert. See generally* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, p. 376 n. 113 (2d ed. 2000) (quoting A. Bradford Hill). *See also In re Neurontin Mktg., Sales Practices, & Prod. Liab. Litig.*, 612 F. Supp. 2d 116, 133 (D. Mass. 2009).

However, it is important to remember that "'the Bradford Hill criteria are used to establish **general** causation from epidemiological studies – they are not used to establish **specific** causation.'" *Yarbrough v. Hunt Southern Group LLC*, No. 1:18CV51-LG-RHW, 2019 WL 4392519, at *4 (S.D. Miss. Sept. 12, 2019). (Emphasis added) (citing *In re Viagra Prod. Liab. Litig.*, 658 F. Supp. 2d 950, 958 and *Jones,* 235 F. Supp. 3d 1244, 1267, *aff'd in part sub nom. Jones v. Novartis Pharm. Co.,* 720 F. App'x 1006.

As a threshold matter, it should be noted that Sir Austin Bradford Hill made the point that "None of my nine viewpoints can bring indisputable evidence for or against the cause-and-effect hypothesis and **none can be required** as a *sine qua non*." A. Bradford Hill, *The Environment and Disease: Association or Causation*?, 58 Proc. Royal Soc'y Med. 295 (1965) (Emphasis added), quoted in *Neurontin MDL Opinion,* [App. E]*, supra.*

This is important to bear in mind when, as here, a defendant seeks to elevate one or two of the factors – in this case both *strength of association* and *dose response* – to *sine qua non* status. Rather than accepting such limitations, courts making *Daubert* rulings have generally embraced the "weight of the evidence" approach, sometimes also called the "inference to the best explanation." *See e.g., Milward v. Acuity Specialty Prod. Grp., Inc*., 639 F.3d 11, 17 (1st Cir. 2011)("Although Hill identified nine viewpoints, it is generally agreed that this list is not exhaustive and that no one type of evidence must be present before causality may be inferred. For example, when a group from the National Cancer Institute was asked to rank the different types of evidence, it concluded that '[t]here should be no such hierarchy.'").

The phrase "Bradford Hill" is terminology often employed by epidemiologists and lawyers and judges struggling with scientific issues. However, this matrix for analysis has been used to determine reliability. Consequently, although Dr. Catenacci does not actually cite the Bradford Hill paper, an examination of his report reflects that his opinions are perfectly reliable within the purview of this method. We therefore exam the report through the prism of several of these factors:

1.      *Strength of the Association and Consistency.* Many of the articles that Dr. Catenacci cites have consistent, positive relative risks or odds ratios, that *are statistically significant*:

- 2014 meta-analysis "found that workers in the sector of repair and installation of machinery exposed to asbestos were at increased risk of colorectal cancer (RR = 1.40, 95%CI: 1.07-1.84)."[1]

---

[1] Ex. A at 8.

- 2014 study found "[t]his prospective population-based study showed that asbestos exposure was associated [statistically significant] with overall gastric cancer, EAC, GNCA, total and distal colon cancer and rectal cancer."[2]
- 2017 study found that "colon cancer was significantly associated with cumulative exposure (HR = 1.14; 95% CI: 1.04 to 1.26 for a 1-unit increase in ln-CEI) and ≥ 20-40 years since first exposure (HR = 4.67; 95% CI: 1.92, 11.46 vs. 0-20 years TSFE)."[3]
- 2019 meta-analysis "concluded that occupational exposure to asbestos was significantly associated with colorectal cancer with an overall pooled standardized mortality ratio of 1.16 (95% CI: 1.05 to 1.29).[4]
- 2020 meta-analysis concluded "The overall colorectal cancer SMR for synthesis cohort was 1.07 (95% CI 1.02–1.12)."[5]

Importantly, the *Selikoff* article on page 6 reflects that 29 study participants died of cancer of the stomach, colon, or rectum "compared with 9.4 expected." This is more than a doubling of the risk.

"Consistency" of data and risk is another important Bradford Hill factor that must be considered in tandem with the point estimate of risk. Of the three "meta-analyses" cited by Dr. Catenacci on pages 8-9 of his report and cited above, all of which were published since 2012, all three show statistically significant, positive, or "elevated" risks. Oddone (2013; RR =- 1.40); Kwak (2018; "Mortality Ratio" = 1.16); Huang (2017) (Risk = 1.07). It is perfectly acceptable for an expert to consider the *consistency* of the evidence in arriving at an opinion.

UP also points out that the IARC experts were split on the causality of colon cancer. But from a general causation standpoint, the only IARC grouping for asbestos is as Group 1.

Dr. Catenacci acknowledges the divergent views on the question of whether ingested asbestos causes colon cancer. His quotes the 2012 IARC Monograph, at the time the IARC classifications were done: "For cancer of the colorectum, the Working Group was **evenly divided** as to whether the evidence was strong enough to warrant classification as *sufficient."* Report at 7/15 (Emphasis added). [Note: "Sufficient" equates to Group 1, *i.e.*, definitely carcinogenic.]

---

[2] *Id.* at 9.
[3] *Id*. at 9.
[4] *Id*. at 8.
[5] *Id*. at 9.

But Dr. Catenacci points out that IARC's classification was first noted and documented in 2009 and then refined in 2012. He makes clear that "there is ample evidence that asbestos causes colon cancer…."much of this evidence **has come out since 2012**." Report at 7/15 (emphasis added). This was after the last IARC classification related to asbestos and colon cancer and much of the evidence is by way of the epidemiological studies that have largely been discussed above.

As this Court determines whether there is a "reliable" basis for Dr. Catenacci's general causation opinion about colon cancer, it is significant to note that the IARC website itself cautions that, when one reviews IARC classifications "it is strongly recommended to consult the complete *Monographs* on these agents, the **publication date**, and the list of studies considered. Significant **new information** might support a different classification." www.monographs.iarc.fr (October 27, 2020) (Judicial notice requested).

Dr. Catenacci's report discusses the "significant new information" since 2012. He identifies newer, peer-reviewed scientific studies that demonstrate a statistically significant elevated risks for these cancers. Although most of these studies do not demonstrate a 2.0 relative risk threshold for which UP argues, that is not a requirement. Rather, these studies demonstrate the *consistency of association* Bradford Hill factor because they all provide relative risks above 1.0 with accompanying confidence intervals that allow them to be "statistically significant."

2.      *Biologic Plausibility and Animal Experimentation.* Dr. Catenacci's report clearly cites **both** (a) a plausible biological mechanism or pathway, **and** compelling experimental studies in animals. Report at 3-8. Dr. Catenacci's report indicates that he has "published numerous publications focusing on . . . biologic mechanisms." Pages 2-5 of his report discusses the biological nature of cancer cells. He explains that carcinogens "are substances or agents that promote DNA changes leading to cancer." He further explains that "colon cancers start at the level of an individual cell . . . that acquires genetic alteration." *Id*. at 5/15. When he addresses the biologic

plausibility of airborne asbestos particles leading to colon cancer, Dr. Catenacci explains the basis of his opinion in explicit terms: "When asbestos fiber in the air are inhaled, . . . some fibers . . . can also be swallowed." *Id.* at 6/15. His report also chronicles data documenting that 38% of asbestos exposed workers who "developed colon cancer" "were found to have asbestos fibers and/or bodies present in their colon tissue." Again, strong evidence militating in favor of causality.

IARC classifications also depend heavily on **animal studies**. This correlates with the Bradford Hill factor "*experimentation."* Dr. Catenacci discusses the available animal data on pages 7-8 of his report. They show both "strength of association" and "specificity of same". They also discuss the biologically plausible pathways that militate in favor of a finding of causality. After reviewing these studies Dr. Catenacci states that '[o]verall and taken together, it is my opinion that, collectively, these such studies provide a mechanistic carcinogenesis effect of asbestos exposure towards colorectal cancer development." *Id.* at 7.

3.    *Dose Response* is another important Bradford Hill factor, but, in all fairness, it cannot be elevated to the be all and end all of the analysis as UP attempts to do. Moreover, one should not confuse the Bradford Hill concept of a "dose response curve", which is germane to **general** causation with levels of **exposure** to asbestos, pertinent to **specific causation.**

The main significance of a dose response curve is that it tends to show that an increased exposure causes an increased risk. It is not proof positive of a causal relationship, but it certainly is strong evidence that an inference of causality is permissible. In this case, because asbestos is an IARC Group 1 substance, dose response curves are not nearly as important. Nonetheless, studies cited by Dr. Catenacci include dose-response data supporting a link between asbestos and colon cancer. For instance, *Huang et al* that Dr. Catenacci cites on page 8 of his report states: "The results show that the risk of colorectal cancer increased gently with higher accumulation." Ex. D (Huang

et al) [6] at 205. The *Schneiderman* article cited on page 6 of his report states "Good dose-response data, with quantitative estimates of dose are uncommon; however, in all the literature reviewed only one paper did not support the conclusion that increased exposure to inhaled asbestos particles leads to increased digestive system cancer." Ex. E (Schneiderman)[7] at 1.

    *4.*    *Temporality.* This Bradford Hill factor can be important when a drug or chemical agent causes an immediate reaction. Because it is "generally accepted" that the latency period of asbestos induced cancers is extremely long, this factor is not particularly germane in this case.

    *5.*    *Specificity.* All the above studies cited by Dr. Catenacci also support specificity because they were designed to rule out or otherwise control for other potential causes of colon cancer in the study populations, including smoking. As an example, see pages 8-9 of Dr. Catenacci's report where he states "[a]n important epidemiologic study not included in any of the above meta-analyses was conducted in French men….adjusting for smoking….In another epidemiologic study not included in the above meta-analyses, the Netherlands Cohort Study,….was studied specifically…the influence of potential confounders…").

    The bottom line is that, for all of the reasons set forth above, both portions of Dr. Catenacci's general causation opinions are reliable.

## IV.    DR. CATENACCI'S SPECIFIC CAUSATION OPINION IS RELIABLE.

    With respect, UP's specific causation challenge is very sparse. Only two issues merit discussion or response.

    **A.**    **Both Dr. Catenacci's reliance on the opinions of industrial hygienist Richard Miller, B-Reader Dr. Courtney Crim, and his own independent review of Rodriguez's**

---

[6] Huang Q, Lan YJ. Colorectal cancer and asbestos exposure-an overview. Ind Health. 2020 Jun 9;58(3):200-211. doi: 10.2486/indhealth.2018-0271. Epub 2019 Sep 12. PMID: 31511437; PMCID: PMC7286717.

[7] Schneiderman MA. Digestive system cancer among persons subjected to occupational inhalation of asbestos particles: a literature review with emphasis on dose response. *Environ Health Perspect*. 1974;9:307-311. doi:10.1289/ehp.749307.

**occupational exposures provide reliable evidence that the quantities of asbestos Rodriguez**

**was exposed to during his 11-year carrier with the railroad contributed to his colon cancer.**

In toxic tort cases, it is important to remember that "[h]uman exposure occurs most frequently in occupational settings where workers are exposed to industrial chemicals like lead or asbestos; however, even under these circumstances, it is usually difficult, if not impossible, to quantify the amount of exposure." Federal Judicial Center, Reference Manual on Scientific Evidence 640 (3d ed. 2011) (cited, *inter alia*, by *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 264 (4th Cir. 1999)). This difficulty has been acknowledged in this Circuit and specifically by this Court.

As is required under Fifth Circuit jurisprudence, "[s]cientific knowledge of harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiff's burden in a toxic tort case." *Carter v. Southstar Mgmt., LLC*, No. CV H-17-727, 2018 WL 5281791, at *3 (S.D. Tex. Oct. 24, 2018) (quoting *Seaman v Searcor Marine L.L.C.*, 326 Fed. Appx 721, 723 (5th Cir. 2009), [App. C]. Importantly, "[w]hile plaintiffs are not required to provide evidence of the precise level of exposure to a toxic substance, there should be sufficient information of the level of exposure." *Carter v. Southstar Mgmt., LLC*, No. CV H-17-727, 2018 WL 5281791, at *3; *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 671 (5th Cir. 1999) ("However, the law does not require plaintiffs to show the precise level of benzene to which they were exposed.").

Consistent with this case law, in *McManaway v. KBR, Inc.*, this Court rejected "KBR's argument that Dr. Carson's testimony is unreliable because he does not calculate Plaintiffs' dose of sodium dichromate exposure." *McManaway*, No. CV H-10-1044, 2012 WL 13059744, at *5.

As previously noted, Dr. Catenacci relied on the unchallenged opinions and expertise of industrial hygienist Richard Miller. Mr. Miller offered opinions regarding Rodriguez's extensive asbestos exposure. *Id*. at 3-35. This included a review of Rodriguez's specific job tasks,

depositions of coworkers, review of internal railroad documents, and a survey of the scientific literature. *Id*. Rodriguez's primary exposure to asbestos was his use of asbestos ropes on broken rail lines. This was confirmed by coworkers Jose Rodriguez and Rito Ortega. *Id*. at 7, 13, 20, 22-25. The railroad has admitted to having asbestos rope both in discovery responses and internal documents. *Id*. at 21, 25-39. Rodriguez would use the rope sometimes daily, sometimes all day. *Id*. at 20. The asbestos rope would be used every day in the winter. *Id*. at 21. It would sometimes be used in the summer. *Id*. at 24-25. This asbestos rope exposure was continual through the 1970's, virtually the entirety of Rodriguez's 11-year railroad career. *Id*. at 23-24. The asbestos rope would be soaked in diesel, laid on the rails, lit on fire, and Rodriguez would stand in the smoking asbestos rope beating the rails back together. *Id*. 20-25, 33.

Dr. Catenacci also reviewed this information. Ex. A at 3, 5. Mr. Miller goes on to do a more extensive analysis on the link between asbestos and colon cancer and Rodriguez's individual exposure. *Id*. at 3-35. For the sake of brevity, Mr. Miller's ultimate conclusions were that:

> Thus, in summary, it is my professional opinion that Mr. Rudy Rodriguez was, more likely than not, exposed to asbestos fibers … products from the use of the so-called "magic rope" in his daily work repairing rails near the Sierra Blanca and Fort Hancock, TX sites….All of these exposure events would have substantially increased Mr. Rodriguez' risk for cancer.

*Id*. at 47. This evidence, and the opinions based on it, are not challenged by UP. Catenacci relied on them and came to similar conclusions through his own independent review. Ex. A at 5-6, 11.

Dr. Catenacci also relied the report from B-Reader Dr. Courtney Crim, who reviewed Rodriguez's imagining. He determined that "[i]n the setting of appropriate occupational exposure, this finding is supportive of asbestosis." Ex. F; Ex. A at 6. This is objective evidence that Rodriguez had significant asbestos exposure.

Therefore, through his reliance on the unchallenged opinions of industrial hygienist Richard Miller and B-Reader Dr. Courtney Crim, and through his own analysis, Dr. Catenacci has

provided sufficient information about Rodriguez's prolonged exposure to asbestos to render his opinion reliable under 5th Circuit jurisprudence and this Court's opinion in *McManaway, supra* .

**B.      The Law Does Not Require an Expert to "Rule Out" Other Contributing Causes of the Cancer.** UP accuses Dr. Catenacci of failing to "rule out" smoking, obesity and diabetes as causes of his colon cancer." Doc. 31 at 11/15. Not true! He ruled them IN: "Factors that, more likely than not, **each contributed** to the development of his colorectal cancer <u>include</u> his exposure to asbestos, his documented obesity, his smoking and his diabetes." Report at 11/15.

Cancer is multifactorial, and the law recognizes that multiple factors can cause disease or injury. Under FELA, UP is jointly and severally liable for all damages IF Rodriguez's exposure to asbestos "played any part, even the slightest, in producing the injury." *CSX Transportation, Inc. v. McBride*, 564 U.S. 685 (2011). Ironically, this would be true even if (A) the sole cause was asbestos exposure, but (B) Rodriguez had other workplace exposures to asbestos. *Norfolk & W. Ry. Co. v. Ayers,* 538 U.S. 135, 141 (2003)("FELA's express terms, reinforced by consistent judicial applications of the Act, allow a worker to recover his entire damages from a railroad whose negligence jointly caused an injury [here, the chronic disease asbestosis]").

UP's citation to the Nebraska court's opinion in *Byrd v. Union Pacific Railroad Co.,* 5453 F.Supp.3d 1260 (D. Neb. 2020) is misleading. There the court said that to prove its "sole cause" affirmative defense, the railroad would have to "rule out" other causes. That is because the defense is "**sole** cause." The plaintiff does not have to prove "sole cause" to win his case. Indeed, under FELA, he does not even have to prove "substantial factor." To win, he only needs to meet the "played any part, even the slightest" burden of proof.

None of the other three cases cited by UP support the "rule out" argument it makes. First, like UPRR's expert Dr. Dawkins in this case, the expert in *Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 279 (5th Cir. 1998) was excluded because he "cited no scientific support of his theory" and

[n]one of *Daubert's* factors … was met." The "personal habits and medical history" was *dicta*. The same is true of *Claar v. Burlington N. R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994), cited, presumably, because it was a FELA case. There the main reason for the district court's exclusion was that the experts simply "failed to explain the basis for their conclusions" even after "the district court repeatedly ordered the experts to explain the reasoning and methods underlying their conclusions." Once again, the failure to "rule out" other causes was obviously an additional observation and not *ratio decidendi.* Finally, the expert in *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 50 (2d Cir. 2004) was not excluded for failure to "rule out" alcohol and smoking. He was excluded, *inter alia,* for ignoring them altogether. This is unscientific as the court noted.

Additionally, in ruling in and out various causes of Rodriguez's colon cancer, Dr. Catenacci employed the use of the standard medical methodology of "differential diagnosis." This Court endorsed the use of this methodology in *McManaway*, and it is hardly alone in doing so. "The overwhelming majority of the courts of appeals that have addressed the issue have held that a medical opinion on causation based upon a reliable differential diagnosis is sufficiently valid to satisfy the first prong of the Rule 702 inquiry." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 263 (4th Cir. 1999)). *Accord Johnson v. Arkema, Inc.*, 685 F.3d 452, 468 (5th Cir. 2012). Dr. Catenacci utilized this well accepted methodology in arriving at his specific causation opinions in this case. He determined that asbestos, obesity, smoking and diabetes all contributed to the development of Rodriguez's colon cancer. Ex. A at 10. He determined that genetics and sedentary lifestyle did not. *Id*. Therefore, Dr. Catenacci did not ignore Rodriguez's other risk factors. He considered them and opined that they were contributory. So, too, was asbestos.

## Conclusion

Finally, we note without the necessity of elaboration that Dr. Catenacci's extensive and scholarly report establishes beyond cavil that he has brought the same level of "intellectual rigor"

to his task as a witness in this case as he does to his clinical practice and teaching/writing duties as a professor at the University of Chicago Medical School. Therefore, for all of the reasons stated herein, Defendant's Motion to Exclude should be denied. Because its Motion for Summary Judgment relies on the Motion to Exclude, it, too, should be denied, and the case should proceed to trial as scheduled.

Respectfully submitted,

VICKERY & SHEPHERD, LLP

*/s/ Arnold Anderson Vickery*
Arnold Anderson Vickery
Texas Bar No. 20571800
Fred H. Shepherd
Texas Bar No. 24033056
Brian B. Winegar
Texas Bar No. 24081218
Earl Landers Vickery
Texas Bar No. 20571900
10000 Memorial Dr., Suite 750
Houston, TX  77024-3485
Telephone: 713-526-1100
Facsimile: 713-523-5939
Email: andy@justiceseekers.com
Email: fred@justiceseekers.com
Email: brian@justiceseekers.com
Email: lanny@justiceseekers.com
*Counsel for Plaintiff*

<u>Certificate of Service</u>

I hereby certify that on November 12, 2020, Plaintiff's Response in Opposition to Defendant's Motion to Exclude the Causation Opinion of Daniel Catenacci, M.D. was electronically filed with the Clerk of Court using the ECF system, which will send an email notification of such filing to the following counsel of record:

>Gregory S. Hudson, Esq.
>Julia Gandara Simonet, Esq.
>Laura Reinhart, Esq.
>COZEN O'CONNOR
>1221 McKinney St., Suite 2900
>Houston, TX  77010

>>>*/s/ Arnold Anderson Vickery*
>>>Arnold Anderson Vickery